**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Debra Roman, | : | |
| | : | |
| Plaintiff, | : | No. 3:20-cv-00045-MEM |
| | : | |
| v. | : | |
| | : | |
| Geisinger Wyoming | : | |
| Valley Medical Center and | : | |
| Maria Cumbo, | : | |
| | : | |
| Defendants. | : | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
THE MOTION FOR SUMMARY JUDGMENT FILED BY
DEFENDANTS GEISINGER WYOMING VALLEY
MEDICAL CENTER AND MARIA CUMBO**

Anthony (T.J.) Andrisano, Esq. (PA 201231)
Sara E. Myirski, Esq. (PA 321113)
409 North Second Street, Suite 500
Harrisburg, PA  17101
Telephone: (717) 237-4800
Fax: (717) 233-0852
Email:  anthony.andrisano@bipc.com
Email:  sara.myirski@bipc.com
*Attorneys for Defendants*

Date:  June 30, 2021

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
THE MOTION FOR SUMMARY JUDGMENT FILED BY
DEFENDANTS GEISINGER WYOMING VALLEY
MEDICAL CENTER AND MARIA CUMBO**

Pursuant to FED.R.CIV.P. 56, Defendants Geisinger Wyoming Valley Medical Center (hereinafter, "Geisinger") and Marie Cumbo (hereinafter, "Cumbo"; with Geisinger, collectively hereinafter, "Defendants"), by and through their undersigned counsel, Buchanan Ingersoll & Rooney PC, hereby submit the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, which is being filed contemporaneously herewith.

**Procedural History**

1.     On January 9, 2020, Plaintiff Debra Roman (hereinafter, "Plaintiff"), initiated the instant litigation, by filing a Complaint raising a single cause of action against Geisinger for purported violation of Title VII of the Civil Rights Act ("Title VII").  (Doc. 1).

2.     Geisinger filed an Answer with Affirmative Defenses to the Complaint on January 30, 2020.  (Doc. 5).

3.     Subsequently, on March 11, 2020, Plaintiff filed an Amended Complaint, additionally naming Cumbo, and asserting the following claims: i) violation of Title VII, against Geisinger; ii) an invasion of privacy claim, against Defendants; and iii) a claim for violation of the Pennsylvania Human Relations Act ("PHRA"), against Cumbo.  (Doc. 11).

4.      Plaintiff points to the following incidents she allegedly experienced in support of her Amended Complaint: a reprimand on April 25, 2019; being "bullied" on May 1, 2019; being placed on call for her birthday; being sent home early from work on May 9, 2019; Cumbo's alleged isolation of others from Plaintiff; a purported lower-than-normal evaluation; and her termination in June, 2019.  (*Id.* at ¶¶14-19).

5.      Defendants filed a Partial Motion to Dismiss the Amended Complaint on March 25, 2020, seeking to dismiss Plaintiff's invasion of privacy claim.  (Doc. 16).

6.      By Order dated March 29, 2021, this Honorable Court granted Defendants' Partial Motion to Dismiss, dismissing Plaintiff's invasion of privacy claim in its entirety.  (Doc. 27, ¶1).

7.      Defendants filed an Answer with Affirmative Defenses to the Amended Complaint on April 7, 2021.  (Doc. 28).

8.      The parties conducted discovery and this matter is ripe for Summary Judgment in accordance with this Honorable Court's most recent Scheduling Order. (Doc. 31).

## General Background

9.      Plaintiff is a Registered Radiation Therapist.  (Doc. 11, ¶1).

10.    Plaintiff worked for Defendant Geisinger beginning in or around November 2007.  (Doc. 11, ¶1).

11.    Geisinger's Radiation Therapists work as part of a team to prepare for and administer radiation therapy to oncology patients.  (Exhibit A, Affidavit of Marie Cumbo (hereinafter, "Cumbo Aff."), ¶4).

12.    During the relevant time period (2019), Plaintiff worked in the department under Lori Starbuck, Chief Radiation Therapist, and Marie Cumbo, Operations Manager.  (Ex. A, Cumbo Aff., ¶5).

**Geisinger' Policies**

13.    All Geisinger employees are subject to its employment policies, including its Code of Conduct.  (Exhibit B, Affidavit of Robert ("Bob") Konopke (hereinafter, "Konopke Aff."), ¶¶4-5).

14.    The Code of Conduct includes a "Harassment and Disruptive Behavior" Policy.  (Ex. B, Konopke Aff., ¶5; Exhibit C, Code of Conduct, Geisinger 00478-514, at Geisinger 00509).

15.    As part of that Policy, the Code of Conduct provides that Geisinger "expect[s] you to treat your coworkers with respect, dignity and fairness."  (Ex. B, Konopke Aff., ¶5; Ex. C, Code of Conduct, at Geisinger 00509).

16.    The Code of Conduct goes on to prohibit "'intimidating and disruptive behaviors', including, but not limited to, overt actions such as verbal outbursts and

3

physical threats; passive activities such as refusing to perform assigned tasks or quietly exhibiting uncooperative attitudes during routine activities; reluctance or refusal to answer questions, return phone calls or pages; condescending language or voice intonation; and impatience with questions."  (Ex. B, Konopke Aff., ¶5; Ex. C, Code of Conduct, at Geisinger 00509).

17.   Such conduct is prohibited because they "can foster medical errors, contribute to poor patient satisfaction and preventable adverse outcomes, increase the cost of care and cause qualified clinicians, administrators, managers and affected employees to seek new positions in more professional environments."  (Ex. B, Konopke Aff., ¶5; Ex. C, Code of Conduct, at Geisinger 00509).

18.   In short, disruptive behaviors "undermine team effectiveness and can compromise the safety of patients."  (Ex. B, Konopke Aff., ¶5; Ex. C, Code of Conduct, at Geisinger 00509).

19.   Indeed, "intimidating and disruptive behaviors are unprofessional and should not be tolerated."  (Ex. B, Konopke Aff., ¶5; Ex. C, Code of Conduct, at Geisinger 00509).

20.   Geisinger's Code of Conduct further provides, "[a] violation of the standards described in this Code of Conduct — or of any Geisinger policy — can result in disciplinary action, up to and including discharge from employment or

termination of your contract."  (Ex. B, Konopke Aff., ¶5; Ex. C, Code of Conduct, at Geisinger 00506).

21.    Code of Conduct violations may not be cited by individual supervisors alone; Human Resources must be engaged.  (Ex. A, Cumbo Aff., ¶6; Ex. B, Konopke Aff., ¶¶6-7).

**Plaintiff's Performance Issues**

22.    During her employment with Geisinger, Plaintiff had numerous performance/disciplinary issues, including an exchange with a co-worker, R.S. several years ago, which resulted in a counseling session with Cumbo.  (Ex. A, Cumbo Aff., ¶¶7-9; Ex. B, Konopke Aff., ¶20; Exhibit D, September 12, 2011 Performance Improvement Plan ("PIP"), Geisinger 00196-198).

23.    Within days of the counseling session with Cumbo, Plaintiff had another "confrontational exchange" with R.S.  (Ex. A, Cumbo Aff., ¶9; Ex. D, September 12, 2011 PIP, at Geisinger 00196).

24.    As a result, Plaintiff was cited by Cumbo for a Code of Conduct violation.  (Ex. A, Cumbo Aff., ¶¶7-9; Ex. B, Konopke Aff., ¶20; Ex. D, September 12, 2011 PIP, Geisinger 00196-198).

25.    In the resulting PIP, Plaintiff was reminded that "[i]nteractions with coworkers in the workplace should be respectful and professional at all times."  (Ex. A, Cumbo Aff., ¶9; Ex. D, September 12, 2011 PIP, at Geisinger 00197).

26.     As a result of the incident, "Ground Rules" were established for Plaintiff and several other co-workers, including R.S. and Starbuck. (Ex. A, Cumbo Aff., ¶10; Exhibit E, Ground Rules, Geisinger 00199-200).

27.     As part of the Ground Rules, Plaintiff and the others agreed that they would "act professionally" and "be mindful of what patients can hear and what their perception might be." (Ex. A, Cumbo Aff., ¶10; Ex. E, Ground Rules, at Geisinger 00199).

28.     In April, 2019, Plaintiff was treating with a co-worker when the co-worker asked the patient, "[e]xcuse me, can you state your name and date of birth," to which Plaintiff reacted by placing her arm around the patient, informing the patient that they would have to "excuse [co-worker] that is just her personality, she always interrupts conversations." (Ex. A, Cumbo Aff., ¶¶18, 20; Exhibit F, Marie Cumbo's Typewritten Notes (hereinafter, "Notes"), Geisinger 00468-477, at Geisinger 00472).

29.     Around the same time, a different patient asked where a Therapist was, and the treating Therapist indicated that they were at another machine, to which Plaintiff remarked "[i]t is what happens here management kicks you off the island." (Ex. A, Cumbo Aff., ¶¶18, 21; Ex. F, Notes, at Geisinger 00473).

30.     The Therapist responded "no, we really rotate between the different areas within our department to keep us fresh and up to date," to which Plaintiff

remarked, "[w]ell, you can believe what you want."  (Ex. A, Cumbo Aff., ¶¶18, 21; Ex. F, Notes, at Geisinger 00473).

31.     Following report of the incidents, Cumbo, Starbuck, and Plaintiff met. (Ex. A, Cumbo Aff., ¶¶18, 22; Ex. F, Notes, at Geisinger 00472).

32.     When confronted, Plaintiff responded that Cumbo and Starbuck were "killing her" because they "got caught with [their] pants down".  (Ex. A, Cumbo Aff., ¶¶18, 22; Ex. F, Notes, at Geisinger 00473).

33.     Cumbo told Plaintiff she should not talk to Cumbo or Starbuck in that tone or manner.  (Ex. A, Cumbo Aff., ¶¶18, 23; Ex. F, Notes, at Geisinger 00473).

34.     At her deposition, Plaintiff did not dispute making the comment to her supervisors.  (Exhibit G, Deposition of Debra Roman (April 9, 2021) (hereinafter, "D. Roman Dep."), 82:11-15).

35.     During the meeting, Plaintiff also complained of being placed on-call for her birthday – but on-call status is completed by rotation, which she was reminded of by Cumbo.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00473).

36.     As a result of Plaintiff's conduct, Cumbo consulted with Human Resources.  (Ex. A, Cumbo Aff., ¶24).

37.     On April 25, 2019, Cumbo met with Starbuck, Plaintiff, and Lisa Keifer (Associate Vice President, Cancer Institute) regarding the comments Plaintiff made

during the prior meeting.  (Ex. A, Cumbo Aff., ¶¶18, 25; Ex. F, Notes, at Geisinger 00473).

38.   Cumbo specifically told Plaintiff that she needed to be respectful and not use inappropriate comments, such as "you were caught with your pants down." (Ex. A, Cumbo Aff., ¶¶18, 26; Ex. F, Notes, at Geisinger 00473).

39.   Despite her actions, Plaintiff was not issued any discipline at the April 25, 2019 meeting.  (Ex. A, Cumbo Aff., ¶27; Ex. B, Konopke Aff., ¶28).

40.   After the meeting, Plaintiff failed to return to her assigned area to perform work, despite her shift not being over.  (Ex. A, Cumbo Aff., ¶¶18, 28; Ex. B, Konopke Aff., ¶23; Ex. F, Notes, Geisinger 00473).

41.   Plaintiff did not report to Starbuck or Cumbo where she was going or that she needed coverage for her assignment.  (Ex. A, Cumbo Aff., ¶¶18, 29; Ex. B, Konopke Aff., ¶23; Ex. F, Notes, at Geisinger 00473).

42.   The same day, Cumbo attended a meeting with Kerri Michalik (Vice President, Cancer Institute), Keifer, and Bob Konopke (Senior Human Resources Generalist) where she discussed Plaintiff's absence.  (Ex. A, Cumbo Aff., ¶¶18, 30-31; Ex. B, Konopke Aff., ¶24; Ex. F, Notes, at Geisinger 00474).

43.   Plaintiff was then brought in the meeting to discuss the ongoing issues. (Ex. A, Cumbo Aff., ¶¶18, 31; Ex. B, Konopke Aff., ¶26; Ex. F, Notes, at Geisinger 00474).

44.     The following day, April 26, 2019, Keifer emailed Plaintiff to summarize the meeting and outline expectations Geisinger had going forward:

Debbie,
Good morning. Thank you for meeting with us yesterday to discuss your concerns. I just wanted to provide a summary of the discussion and the expectations so that everyone is on the same page.

1.  Please keep Lori & Marie up to date on any pending appointments as much in advance as possible. If you know you will be called for an appointment in the next 3 days please make them aware as soon as you know.
2.  Please let Lori know if you need to step away from the clinic.
3.  As your supervisors, Marie & Lori, should be respected. This includes conversations and tone.
4.  We appreciate your commitment to the patients and the compassion you have for the patients. Please try and remain focused on the patients.
5.  Marie has already spoken to IT and ISS staff about not congregating at the treatment console area or having loud discussions.
6.  As was discussed as a group the department will be devising expectations moving forward. However, CI CARE principles should always be utilized in all interactions, even with co-workers.
7.  As long as co-workers are greeting you on a daily basis, engagement in conversations may take time to resume and shouldn't be viewed as retaliation.

If I missed something that should have been included in the summation please let me know. Otherwise, I expect us to be able to move forward towards a cohesive well-functioning team.

(Ex. A, Cumbo Aff., ¶33; Ex. B, Konopke Aff., ¶27; Exhibit H, April 26, 2019 Email from L. Keifer to D. Roman, Geisinger 00258).

45.     On May 1, 2019, Plaintiff approached Cumbo in the hallway, asking Cumbo to look at something on her phone – the definition of being "caught with your pants down."  (Ex. A, Cumbo Aff., ¶¶18, 34; Ex. B, Konopke Aff., ¶30; Ex. F, Notes, at Geisinger 00474).

46.     Cumbo declined the invitation, indicating – once again, that the comment was offensive and viewed as insubordination given their meeting.  (Ex. A, Cumbo Aff., ¶¶18, 35; Ex. F, Notes, at Geisinger 00474).

47.     Plaintiff proceeded to place her phone in front of Cumbo and started to read from her phone.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00474).

9

48.     At her deposition, Plaintiff admitted that she tried to raise the incident with Cumbo.  (Ex. G, D. Roman Dep. 83:18-23).

49.     When asked about the incident on May 1, 2019, Plaintiff testified that that she did press the issue:

> 18          So on May 1st we were -- there were no
> 19     patients, and I said to Marie, "May I speak with
> 20     you?"
> 21          And I have the definition, and I said to
> 22     her, "Marie, I just want to clear up -- I want to
> 23     show you the definition."

(Ex. G, D. Roman Dep. 83:18-23).

50.     Later on May 1, 2019, Plaintiff was late returning from lunch because she was in another department (the Intensive Care Unit), with another patient, with whom she had previously interacted, but was not currently treating.  (Ex. A, Cumbo Aff., ¶¶18, 36; Ex. F, Notes, at Geisinger 00474).

51.     Plaintiff's failure to notify her supervisors and appear timely after lunch resulted in a delay on patient care within the department.  (Ex. A, Cumbo Aff., ¶¶18, 36; Ex. F, Notes, at Geisinger 00474).

52.     At her deposition, Plaintiff admitted that she was late to return to her shift after lunch on May 1, 2019.  (Ex. G, D Roman Dep. 142:9-143:4).

53.     On May 9, 2019, Plaintiff came to Cumbo with a list of patient names she had written down, and specifically asked Cumbo whether those patients had talked to Cumbo about Plaintiff and the care Plaintiff provided them.  (Ex. A, Cumbo Aff., ¶¶18, 37-38; Ex. B, Konopke Aff., ¶31; Ex. F, Notes, at Geisinger 00474-475).

54.     At her deposition, Plaintiff acknowledged she confronted Cumbo about at least one patient.  (Ex. G, D. Roman Dep. 144:6-19).

55.     The same day, Plaintiff approached a co-worker in the workroom, telling the coworker that she was not responsible for the termination of another Therapist.  (Ex. A, Cumbo Aff., ¶¶18, 39; Ex. F, Notes, at Geisinger 00475).

56.     Plaintiff began crying, begging the co-worker not to hate Plaintiff.  (Ex. A, Cumbo Aff., ¶¶18, 39; Ex. B, Konopke Aff., ¶32; Ex. F, Notes, at Geisinger 00475).

57.     Cumbo entered the room, and, seeing the exchange, asked if Plaintiff was okay.  (Ex. A, Cumbo Aff., ¶¶18, 40; Ex. F, Notes, at Geisinger 00475).

58.     Plaintiff responded by stating in an insubordinate tone, "I am crying is that alright?  Am I allowed to cry at work?"  (Ex. A, Cumbo Aff., ¶¶18, 40; Ex. F, Notes, at Geisinger 00475).

59.     When Cumbo asked if Plaintiff was okay, Plaintiff responded that she was and asked that Cumbo leave, which she did.  (Ex. A, Cumbo Aff., ¶¶18, 40; Ex. F, Notes, at Geisinger 00475).

60.     Later that day, Cumbo walked by Plaintiff in the treatment hallway – where patients were present – when Plaintiff was overheard on a phone call discussing the issue with the co-worker and that she could not stand it.  (Ex. A, Cumbo Aff., ¶¶18, 41; Ex. B, Konopke Aff., ¶33; Notes, at Geisinger 00475).

61.     When the call ended, Cumbo approached Plaintiff, who was again crying, and asked if Plaintiff's statement on the phone was in reference to Cumbo.  (Ex. A, Cumbo Aff., ¶¶18, 42; Ex. F, Notes, at Geisinger 00475).

62.     Plaintiff then left for the day.  (Ex. A, Cumbo Aff., ¶¶18, 43; Ex. F, Notes, at Geisinger 00475).

63.     At her deposition, Plaintiff did not dispute that she had the interaction with the co-worker; she also admitted to crying in the workplace during the exchange.  (Ex. G, D. Roman Dep. 146:25-147:3).

64.     During her deposition, Plaintiff further confirmed that she was overheard by Cumbo in the hallway when she was on the phone; Plaintiff testified:

17  phone. This was the treatment area. I was facing
18  the phone. I was facing the machine, and I was
19  talking to my physician. And my physician was
20  asking the -- was asking me specific questions.
21      I had my blood pressure taken by one of
22  the nurses, and she asked me, "What is your blood
23  pressure?"
24      And I was telling her what my blood
25  pressure was. Unbeknownst to me, Marie was stalking
1   me and standing behind me, listening to my entire
2   conversation with my doctor. And I was telling my
3   doctor what my blood pressure was, and my doctor
4   knew what was going on in the department. She had
5   been taking care of me because of the harassment
6   that was going on in the department. She knew what
7   was going on, my blood pressure problems.
8       And I told her what the blood pressure
9   was, and she said to me, "Is this organic, or is it
10  due to the problems in the department?"
11      I said, "No, it's the harassment."

(Ex. G, D. Roman Dep. 155:16-156:11).

65.    Due to the unprofessional and inappropriate conduct Plaintiff was exhibiting, Cumbo engaged Human Resources. (Ex. A, Cumbo Aff., ¶44; Ex. B, Konopke Aff., ¶¶29-34).

66.    After reviewing the information, Human Resources advised that a PIP should be issued. (Ex. A, Cumbo Aff., ¶45; Ex. B, Konopke Aff., ¶35).

67.    On May 13, 2019, Cumbo and Konopke issued a PIP to Plaintiff. (Ex. A, Cumbo Aff., ¶¶46-47; Ex. B, Konopke Aff., ¶¶36-38; Exhibit I, May 13, 2019 PIP, Geisinger 00101-104).

13

68.     The PIP cited Plaintiff in relation to the following performance issues:

> 5/1/19 – Deb escalated the conversation with her manager by stating " you were caught with your pants down".
> It was stated by manager  and Human Resources that this was not an appropriate manner to speak with the
> management team.  Debra approached me in the treatment hallway wanting me to look at her cell phone, on it
> she had what she claimed was the definition of "caught with your pants down" phrase stating I needed to read it.
> I declined stating we have been over this and it is offensive.  She again put phone in front of me and started to
> read it to me. I again declined stating this is inappropriate, she stated that is only the way I have perceived it.

> 5/1/19 – Deb had not returned to the Trilogy treatment unit, which had a direct impact on delaying patient care.
> When she returned to the treatment unit she stated  "I was late returning  from lunch due to the code within the
> department I was being sick in the bathroom due to the patient expiring and we had to say prayers for him, I hope
> this is okay.

(Ex. A, Cumbo Aff., ¶47; Ex. B, Konopke Aff., ¶38; Ex. I, May 13, 2019 PIP, at

Geisinger 00101).

69.     The PIP also cited Plaintiff for her inappropriate comments made in

front of patients:

> 5/9/19 - Deb questioned me on any patients I have met with recently and what they said.  She proceeded to pull
> out a piece of paper with 3 specific patient names.  She asked me about one patient, and I stated the patient had
> continuity of care issues which I spoke to her about.  Debbie asked if the patient mentioned her name.  I stated
> the patient did state how happy she was with the care her by the staff here and the especially the therapist staff.
> She told me that the patient had told her she mentioned her name specifically and if I did not mention that it
> would be because I chose not to.  This clearly states that Debbie has had conversations with patients regarding
> staff members which is inappropriate.

> 5/9/19 - Deb approached another therapist in the therapist workroom.  She told the coworker that she is not
> responsible for the termination of another colleague.  The colleague continued with her work unsure how to
> respond and Debbie was crying, on her knees on the floor and stating please don't hate me.  I entered the room
> asking what the problem was and Deb stated I am crying  is that alright?  Am I allowed to cry at work?  I asked if
> she was okay and she stated she was and asked me to leave her.

(Ex. A, Cumbo Aff., ¶47; Ex. B, Konopke Aff., ¶38; Ex. I, May 13, 2019 PIP, at

Geisinger 00101).

70.   Geisinger issued the following goals for Plaintiff:

**Action Plan:** Document the agreed upon action plan. List action/goals, expected outcomes, timeframe, and specific responsibilities.

As stated previously conversation with any supervisor or coworker must be respectful in tone and conversation.

When stepping out of the clinic or if returning late to the clinic Lori or myself must be notified to ensure proper coverage for the clinic to ensure patient care and safety.

Speaking with patients about/or in regard to other staff members is inappropriate.

Emotional outbursts at work should not occur and proper professional conduct is expected at the workplace per the Geisinger code of conduct.

Immediate and sustained improvement in these areas is expected.  Failure to meet the action plan of this PIP will lead to further disciplinary actions up to and including termination of employment.

(Ex. A, Cumbo Aff., ¶47; Ex. B, Konopke Aff., ¶38; Ex. I, May 13, 2019 PIP, at Geisinger 00103).

71.   On May 31, 2019, a Therapist went to Cumbo and reported that she overheard Plaintiff speaking with a doctor, Dr. Malik, in the treatment hallway, regarding coverage for a weekend appointment.  (Ex. A, Cumbo Aff., ¶¶18, 48, 51; Ex. B, Konopke Aff., ¶39; Ex. F, Notes, at Geisinger 00475; Exhibit J, June 5, 2019 Email from M. Cumbo to M. Cuesta, R. Konopke, and L. Keifer (hereinafter, "June 5, 2019 Email"), Geisinger 00287-288).

72.   Plaintiff responded that no Therapists would come in with her to treat on the weekend, which the Therapist found offensive, because she was never asked by Plaintiff to come in on the weekend.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00475).

73.     At her deposition, Plaintiff admitted to having this interaction.  (Ex. G, D. Roman Dep. 123:3-124:16).

74.     On June 4, 2019, several Therapists reported to Cumbo that a new volunteer came in to Geisinger and that when she met with Plaintiff in the treatment hallway with numerous others, Plaintiff made the comment, "you wouldn't make it working here, you think out of the box like me and that is not allowed here."  (Ex. A, Cumbo Aff., ¶¶18, 49, 51; Ex. F, Notes, at Geisinger 00475-476; Ex. J, June 5, 2019 Email, Geisinger 00287-288).

75.     On June 5, 2019, Geisinger held an Unconscious Bias training, which numerous Therapists including Plaintiff attended.  (Ex. A, Cumbo Aff., ¶¶18, 50-51; Ex. F, Notes, at Geisinger 00476; Ex. J, June 5, 2019 Email, Geisinger 00287-288).

76.     During the presentation, a slide was shown with an image of a group of sheep, with one being apart from the rest.  (Ex. A, Cumbo Aff., ¶¶18, 51; Ex. F, Notes, at Geisinger 00476; Ex. J, June 5, 2019 Email, Geisinger 00287-288).

77.     When the slide was shown, Plaintiff raised her hand and said that it was her, and began crying.  (Ex. A, Cumbo Aff., ¶¶18, 51; Ex. F, Notes, at Geisinger 00476; Ex. J, June 5, 2019 Email, Geisinger 00287-288).

78.     On June 6, 2019, Cumbo, Keifer, and Plaintiff met to discuss the most recent incidents.  (Ex. A, Cumbo Aff., ¶¶18, 51-52; Ex. F, Notes, at Geisinger 00476).

79.     Cumbo and Keifer addressed the issue when Plaintiff made the comment to Dr. Malik about other Therapists not willing to treat with her.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00476).

80.     Cumbo reminded Plaintiff of Geisinger's policy that any Therapist on call who felt they needed assistance when coming in on the weekend may call any other Therapist in with her.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00476).

81.     During the meeting, Cumbo and Keifer asked Plaintiff about the incident with the volunteer, when Plaintiff made comments about thinking outside the box.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00477).

82.     Plaintiff reacted by stating there was free speech in the country.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00477).

83.     Cumbo and Keifer also asked Plaintiff about the Unconscious Bias training.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00477).

84.     Plaintiff responded that it was confidential and they had "no right" to ask her about that.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00477).

85.     Cumbo and Starbuck indicated they were asking because of their concern with how she perceived herself in the workplace, to which Plaintiff responded it was none of their business.  (Ex. A, Cumbo Aff., ¶18; Ex. F, Notes, at Geisinger 00477).

86.    Plaintiff then left the meeting to attend an appointment.  (Ex. A, Cumbo Aff., ¶¶18, 53; Ex. F, Notes, at Geisinger 00477).

87.    Cumbo inquired whether Plaintiff could return to work after the appointment, which Plaintiff responded she may be able to.  (Ex. A, Cumbo Aff., ¶¶18, 51; Ex. F, Notes, at Geisinger 00477).

88.    Upon returning from the appointment, Plaintiff went to Starbuck, and stated, "I am leaving, I have had enough harassment for one day."  (Ex. A, Cumbo Aff., ¶¶18; Ex. F, Notes, at Geisinger 00477).

89.    At her deposition, Plaintiff did not dispute refusing to return to her shift on the 6th, testifying that she did inform Starbuck she was "not up for more harassing that day."  (Ex. G, D. Roman Dep. 177:22-24).

90.    As a result of Plaintiff's continued performance issues, Cumbo again spoke with Human Resources.  (Ex. A, Cumbo Aff., ¶55; Ex. B, Konopke Aff., ¶¶39-40).

91.    Another Human Resources professional, Melissa Cuesta, became involved, reviewed all information, and ultimately recommended suspending Plaintiff pending an investigation.  (Ex. A, Cumbo Aff., ¶¶55-56; Ex. B, Konopke Aff., ¶¶40-41).

92.     On June 7, 2019, Cumbo spoke with Plaintiff, and informed her that she was being suspended pending a Human Resources investigation in relation to the June 6, 2019 events.  (Ex. A, Cumbo Aff., ¶¶18, 57; Ex. F, Notes, at Geisinger 00477).

93.     When delivering the suspension PIP, Plaintiff refused to sign the document, and told Cumbo, "you are ridiculous if you want an unlawful termination lawsuit you will have it, you are a fool."  (Ex. A, Cumbo Aff., ¶¶18, 58-59, 61; Ex. B, Konopke Aff., ¶44; Ex. F, Notes, at Geisinger 00477; Exhibit K, June 7, 2019 Suspension Acknowledgment, Geisinger 00292; Exhibit L, June 13, 2019 PIP, Geisinger 00107-110).

94.     At her deposition, Plaintiff admitted to the exchange, saying she told Geisinger her suspension was "foolish."  (Ex. G, D. Roman Dep. 179:9-13).

95.     Ultimately, Geisinger, as a result of its Human Resources Department's investigation (performed by Ms. Cuesta) made the decision to terminate Plaintiff's employment on June 13, 2019.  (Ex. A, Cumbo Aff., ¶¶60-62; Ex. B, Konopke Aff., ¶¶43-44; Ex. L, June 13, 2019 PIP, Geisinger 00107-110).

96.    The termination PIP, delivered by Ms. Cuesta, cited the following:

> 6/6/19 Inappropriate and disrespectful interactions with manager / administration and of Radiation Oncology. I met with Deb and Lisa Keifer, regarding incidents that occurred earlier in the week in the department.
>
> The point of the meeting was to get Debra's insight as to what transpired. Debra became upset and stated we were harassing her, and she would only speak with management for direct patient care issues. She stated repeatedly she cannot move forward in the department and with management because "too much has happened".
>
> Debra referenced Psalm 37 and indicated she meditates to it daily and recommended we look it up. Deb was still visibly upset, and we ended the meeting and asked her if she felt she would be able to treat patients upon her return from an appointment at Employee Health and she stated she was unsure. I told her to go to her appointment and to see me when she returned.
>
> 6/6/19 After Deb's appointment she returned to the department and stated to Lori Starbuck in the treatment hallway "I am leaving, I have had enough harassment for one day" she then walked out of the department. Deb did not discuss coverage issues with Lori or me.
>
> 6/7/19 Deb arrived for work on Friday and I asked to meet with her and she stated "so this is it, you are going to fire me ". I stated that is not the intent, I informed her she would be on suspension pending HR investigation of yesterday's events. She stated, "that is great I can use a vacation". When asked about why she left 6/6 she stated you told me to leave, I stated that I had asked her to check back with me after the appointment at Employee Health. She asked if I wanted her doctor's note and I stated I did not know she was going to see her physician. I told her I would take the note and she stated she did not believe her attorney would want me to have it. I asked her to sign notice of suspension and she refused, we went over the form and I stated we would be in contact with her. She got up to leave stating "Marie, you are ridiculous and if you want an unlawful termination law suit you will have it, you are a fool." She then left the building.

(Ex. A, Cumbo Aff., ¶61; Ex. B, Konopke Aff., ¶44; Ex. L, June 13, 2019 PIP, at Geisinger 00107).

97.    Geisinger outlined the following with respect to the Action Plan:

> Because of the continued inappropriate and disrespectful behaviors exhibited in the workplace with management and staff within patient care areas, leaving the workplace without permission, creating a hostile work environment by not adhering to the policies and procedures your employment with Geisinger is being terminated effective Thursday, June 13, 2019.

(Ex. A, Cumbo Aff., ¶61; Ex. B, Konopke Aff., ¶44; Ex. L, June 13, 2019 PIP, at Geisinger 00109).

**Plaintiff's Report**

98.    Completely unrelated to her performance issues, on or about March 29, 2019, Plaintiff made a report of purported discriminatory conduct *as to patients* in

the Radiation Department (hereinafter, the "Report").  (Ex. B, Konopke Aff., ¶¶11, 18; Exhibit M, Employment Investigation Tool Kit (hereinafter, "Investigation Record"), Geisinger 00224-230).

99.   As a result of the Report, Geisinger's Human Resources Department conducted an investigation led by Senior Human Resource Generalist Robert Konopke.  (Ex. B, Konopke Aff., ¶¶11-14, 18; Ex. M, Investigation Record, Geisinger 00224-230).

100.  Mr. Konopke performed an extensive investigation, including interviewing numerous employees.  (Ex. B, Konopke Aff., ¶¶11-15, 18; Ex. M, Investigation Record, Geisinger 00224-230).

101.   Mr. Konopke did not inform anyone – during the interview or otherwise – who made the complaint prompting the investigation.  (Ex. B, Konopke Aff., ¶¶14, 18; Ex. M, Investigation Record, Geisinger 00224-230).

102.  During the investigation, Mr. Konopke reminded each person interviewed of Geisinger's policy against retaliation.  (Ex. B, Konopke Aff., ¶¶15, 18; Ex. M, Investigation Record, Geisinger 00224-230).

103.  At her deposition, Plaintiff admitted she was told she would be protected against retaliation with respect to the Report.  (Ex. G, D. Roman Dep. 247:4-5).

104.   As a result of Mr. Konopke's investigation, the employment of R.S. was terminated, effective April 25, 2019.  (Ex. B, Konopke Aff., ¶¶16, 18; Ex. M, Investigation Record, Geisinger 00224-230).

105.   No other employee was terminated or even disciplined as a result of Human Resource's Investigation into Plaintiff's Report.  (Ex. A, Cumbo Aff., ¶64; Ex. B, Konopke Aff., ¶¶17-18; Ex. M, Investigation Record, Geisinger 00224-230).

106.   Plaintiff's Report was made more than two months prior to the termination of her employment.  (*Compare* Ex. B, Konopke Aff., ¶11; *with id.* at ¶42).

107.   Plaintiff had received discipline for similar conduct years prior to her Report.  (Ex. A, Cumbo Aff., ¶¶7-9; Ex. D, September 12, 2011 PIP, Geisinger 00196-198).

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC
By: */s/ Anthony (T.J) Andrisano*
Anthony (T.J.) Andrisano, Esq. (PA 201231)
Sara E. Myirski, Esq. (PA 321113)
409 North Second Street, Suite 500
Harrisburg, PA 17101
Telephone: (717) 237-4800
Fax: (717) 233-0852
Email:  anthony.andrisano@bipc.com
Email:  sara.myirski@bipc.com
*Attorneys for Defendants*

Date:  June 30, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and complete copy of the foregoing document was transmitted to the Court ***electronically*** for filing and for service upon the following parties this day:

Cynthia L. Pollick, Esq.
The Employment Law Firm
PO Box 757
Clarks Summit PA 18411
*Counsel for Plaintiff*

*/s/ Anthony (T.J) Andrisano* _____

Dated:  June 30, 2021