**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEBRA ROMAN,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:20-45** |
| **v.** | : | **(JUDGE MANNION)** |
| **GEISINGER W.V. MEDICAL CENTER and MARIA CUMBO,** | : | |
| | : | |
| **Defendants** | | |

## <u>MEMORANDUM</u>

Pending before the court is the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants Geisinger Wyoming Valley Medical Center (hereinafter, "Geisinger") and Marie Cumbo (collectively "defendants"), (Doc. 33), with respect to the remaining federal and state law claims of retaliation against Geisinger, and her state law aiding and abetting retaliation claim against Cumbo, raised in Counts I & III, respectively, of the amended complaint, (Doc. 11), filed by plaintiff Debra Roman. Specifically, plaintiff claims that after she reported racism against patients, including Blacks and Latinos, as well as against non-English speaking patients by her co-workers to her former employer, Geisinger, defendants retaliated against her and eventually terminated her in violation of Title VII of the Civil Rights

Act ("Title VII"), 42 U.S.C. §2000e, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951, *et seq.*, Count I. In Count III, plaintiff alleges that Cumbo, her former supervisor, aided and abetted Geisinger when it retaliated against her for "complaining about racial, national origin discrimination/hostile work environment", in violation of §955(e) of the PHRA.

In their motion, defendants argue that Geisinger is entitled to judgment as a matter of law with respect to the plaintiff's remaining retaliation claims since plaintiff cannot establish a *prima facie* case of retaliation and retaliatory hostile work environment. Defendants also argue that Combo cannot be found liable as aiding and abetting retaliation under §955(e) of the PHRA as a matter of law since plaintiff failed to establish that Geisinger retaliated against her.

As discussed below, the court will **GRANT** defendants' motion for summary judgment, (Doc. 33), with respect to the plaintiff's remaining claims, (Counts I and III), in her amended complaint, (Doc. 11), against Geisinger and Cumbo. **JUDGMENT** will be entered in favor of the defendants and against the plaintiff.

## I.    BACKGROUND[1]

In her amended complaint filed on March 11, 2020, (Doc. 11), through counsel, in this Title VII and PHRA retaliation case, plaintiff alleges she worked for Geisinger as a Radiation Therapist, and in the Spring of 2019, she reported the above stated discriminatory conduct to her employer. She alleges that after Geisinger investigated her report, she was retaliated against by its employees and harassed by her co-workers, including Cumbo. Plaintiff also alleges that she was "forced, as a condition of employment," to undergo psychological counseling. Subsequently, plaintiff alleges that she received various reprimands, disciplines, and a lower performance evaluation, that culminated when Geisinger terminated her employment on June 13, 2019.

Defendants filed an answer with affirmative defenses to the amended complaint on April 7, 2021. (Doc. 28)

Discovery was then conducted and it has now been completed.

On June 30, 2021, defendants jointly filed their motion for summary judgment, (Doc. 33), with their statement of facts and Exhibits, as well as

---

[1]The court dismissed the plaintiff's state law claim of invasion of privacy against both defendants raised in Count II of the amended complaint on March 29, 2021. (Docs. 26 & 27).

their brief in support. (Docs. 34 & 35). After being granted an extension of time, on July 31, 2021, plaintiff filed her brief in opposition to defendants' motion. (Doc. 43). Plaintiff also filed her response to defendants' statement of facts and Exhibits. (Docs. 38, 40-42, 44). Included as an Exhibit, (Doc. 38), is a CD of the audio transcript of plaintiff's appeal for unemployment compensation. Defendants filed a reply brief on August 16, 2021. (Doc. 46).

The court has jurisdiction over this case pursuant to 28 U.S.C. §1331 because plaintiff avers violations of Title VII. The court can exercise supplemental jurisdiction over her PHRA state law retaliation claim under 28 U.S.C. §1337. Venue is appropriate in this court since the alleged unlawful conduct occurred in this district and all parties are located here. *See* 28 U.S.C. §1391.

## II.   MATERIAL FACTS[2]

---

[2]The court only states the relevant material facts that are supported by citation to the record pursuant to Local Rule 56.1, M.D. PA. Also, legal conclusions and argument are not included. A material fact is one that "might affect the outcome of the suit under the governing law...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Also, since the parties cite to the record to support their material facts and responses thereto, the court does not repeat all of the citations of facts. The court also notes that it does not consider plaintiff's citations to and reliance on uncorroborated hearsay, including plaintiff's citations to her journal entries as well as her alleged statements to a therapist, (Doc. 44), particularly since

Plaintiff, who is a Registered Radiation Therapist, began working for

Geisinger in about November of 2007. As a Geisinger Staff Radiation

_____

she relies heavily upon her journal to dispute the defendants' facts supported by the record and to offer as proof that defendants retaliated against her. As defendants note, (Doc. 46 at 6 n. 1), plaintiff's "therapist was not deposed and there is no other evidence to support these statements." Similarly, the court will not consider Cumbo's notes. (Doc. 34-1, Ex. F). Hearsay statements not capable of being admissible at trial cannot be considered on a motion for summary judgment. *See* Michaux v. Temas, 2020 WL 3799755, *8-11 (W.D. Pa. July 7, 2020) (court held that journal of plaintiffs' decedent was not admissible under any hearsay exception and that it would not be considered in ruling on defendants' summary judgment motion, and that even if it was admissible under an exception, the court would exclude the journal under Rule 403) (citations omitted). Here, plaintiff is offering her journal as proof that defendants retaliated against her and defendants are offering Cumbo's notes as proof that no retaliation occurred. As such, these documents containing out of court statements offered to prove and disprove plaintiff's claims they are clearly hearsay and will not be considered.

The court also notes that it will consider the Affidavits of Robert Konopke and Cumbo, (Doc. 34-1, Exs. A-B), contrary to plaintiff's repeated requests to disregard them as "interested witnesses", since Hill v. City of Scranton, 411 F.3d 118, 129 (3d Cir. 2005), cited by plaintiff no longer supports her position. The Third Circuit subsequently limited Hill and held that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness." Lauren W. v. DeFlaminis, 480 F.3d 259, 271 (3d Cir. 2007). The court finds that neither Cumbo's nor Konopke's Affidavits are "inherently implausible" since they are supported by evidence in the record. Further, since the plaintiff chose not to take any depositions in this case, including those of Cumbo and Konopke, it is now disingenuous for plaintiff to challenge their averments in their Affidavits and ask the court not to consider them as she waived her opportunity during discovery to challenge their averments.

Additionally, the court notes that it will consider plaintiff's deposition testimony to the extent that evidence in the record supports it.

Therapist, plaintiff worked in the Cancer Center/Radiation Oncology Department as part of a team to prepare for and administer radiation therapy to oncology patients. During the relevant time period of this case, plaintiff worked in the Radiation Department under Lori Starbuck, Chief Radiation Therapist, and Operations Manager, Cumbo.

All Geisinger employees must adhere to its employment policies, including its Code of Conduct and its "Harassment and Disruptive Behavior" Policy. (*See* generally Doc. 34-1 at 21-52). The Policy, in relevant part, provides that Geisinger "expect[s] you to treat your coworkers with respect, dignity and fairness", and the Policy prohibits "'intimidating and disruptive behaviors', including, but not limited to, overt actions such as verbal outbursts and physical threats; passive activities such as refusing to perform assigned tasks or quietly exhibiting uncooperative attitudes during routine activities; reluctance or refusal to answer questions, return phone calls or pages; condescending language or voice intonation; and impatience with questions."

The Policy also explained why the above conduct was prohibited and stated that such conduct "can foster medical errors, contribute to poor patient satisfaction and preventable adverse outcomes, increase the cost of care and cause qualified clinicians, administrators, managers and affected

employees to seek new positions in more professional environments." It further explained that intimidating and disruptive behaviors in the workplace "undermine team effectiveness and can compromise the safety of patients", and that they were "unprofessional and should not be tolerated."

Geisinger's Code of Conduct also contained a provision describing penalties for violations of the either the Code or any of its policies, and stated that violations "can result in disciplinary action, up to and including discharge from employment or termination of your contract." However, Code violations could not be cited by an individual supervisor alone without input from the Human Resources Department ("HR").

Plaintiff had performance/disciplinary issues during her employment with Geisinger. In her September 12, 2011 Performance Improvement Plan ("PIP"), plaintiff was cited for an improper exchange with a co-worker, R.S., that occurred on September 2, 2011, and made to undergo a counseling session with Cumbo. (Doc. 34-1 at 57). Shortly after the session, Plaintiff had another "confrontational exchange" with R.S., and this time plaintiff was cited by Cumbo for a Code of Conduct violation and she was issued a verbal warning. In her PIP, plaintiff was instructed by Cumbo that "[i]nteractions with coworkers in the workplace should be respectful and professional at all times."

Due to the incidents between plaintiff and R.S., so-called "Ground Rules" had to be established for plaintiff and several other co-workers, including R.S. and Starbuck, which included the agreement between plaintiff and her co-workers that they would "act professionally" and "be mindful of what patients can hear and what their perception might be." (Doc. 34-1 at 60). The employees were required to sign that they agreed to abide by the stated rules. From September 2011 through March 2019, there is no evidence of performance or work conduct issues with the plaintiff.

However, in April 2019, plaintiff was again found to be acting in an unprofessional manner in front of patients. In one instance, while plaintiff was bringing a patient to the treatment unit, a co-worker asked to interrupt the plaintiff's conversation with the patient and then asked the patient for their name and date of birth. Plaintiff responded by placing her arm around the patient and telling the patient that they would have to excuse her co-worker therapist and that is just how the therapist and she always interrupts conversations.

In another incident, also in April 2019, a different patient asked where plaintiff was, and the treating therapist stated that plaintiff was at another machine. Plaintiff then responded that this is what happens here since management was kicking her "off the island." The other therapist tried to

explain the matter and told the patient that it was due to a normal rotation within the department. Plaintiff then responded in front of the patient that the other therapist could believe what she wanted.

The above stated incidents involving plaintiff's apparent violations of the Code of Conduct resulting in a meeting between Cumbo, Starbuck, and plaintiff. The two incidents were discussed in the meeting and Cumbo told plaintiff that it was not appropriate for her to speak to co-workers like she did, especially in front of patients. Plaintiff responded that Cumbo and Starbuck "got caught with [their] pants down." Plaintiff was then told by Cumbo that she should not talk to either she or Starbuck in that manner. Plaintiff also complained about being placed on-call for her 60th birthday. However, Cumbo reminded plaintiff that the on-call policy is done by rotation and that when the schedule is completed the therapist must find their own replacement.

Following the meeting, Cumbo consulted with HR Department to discuss plaintiff's unacceptable conduct and comments. Subsequently, on April 25, 2019, Cumbo met with Starbuck, plaintiff, and Lisa Keifer, Associate Vice President, Cancer Institute. At this time, Cumbo directed plaintiff to be respectful and not use inappropriate comments in the future, such as "you

were caught with your pants down." After being cautioned by Cumbo, plaintiff was not issued any formal disciplinary action at the April 25, 2019 meeting.

Following the meeting, even though her shift was not yet over, plaintiff did not return to her assigned area so that she could return to do her work. Nor did plaintiff report to either Starbuck or Cumbo regarding where she was going or that she needed someone else to cover for her work. As a result, another meeting was then conducted on April 25, 2019, with Cumbo, Kerri Michalik, Vice President, Cancer Institute, Keifer, and Robert Konopke, Senior Human Resources Generalist. At this meeting, the supervisors discussed plaintiff's unexcused absence from her work area. It was decided that plaintiff should be brought in the meeting to discuss her ongoing work and conduct issues.

The four supervisors discussed their expectations of plaintiff, including knowing her schedule and advising Cumbo or Starbuck if she had to leave the department during her shift. Plaintiff was also told to be respectful to her supervisors as well as her co-workers.

After the second meeting, Keifer emailed plaintiff on April 26, 2019, to memorialize the meeting and to detail the expectations Geisinger had with respect to plaintiff's future performance. (Doc. 34-1 at 147, Ex. H). In particular, plaintiff was again told in the email to let her supervisors Cumbo

and Starbuck know if she had any appointments and if she had to be away from the radiation clinic, and to respect her supervisors, including during conversations and regarding her tone.

Unfortunately, plaintiff's work conduct towards her supervisors did not improve. For instance, on May 1, 2019, plaintiff approached Cumbo and told her she wanted to revisit her discussion about Cumbo and Starbuck being "caught with [their] pants down." Plaintiff stated to Cumbo that she had the definition and wanted to show it to Cumbo. However, Cumbo informed plaintiff that the continued discussion of the matter was inappropriate and viewed as insubordination. As indicated above, such conduct by the plaintiff towards her supervisors was addressed in their April 25, 2019 meeting.

Later on the same day, plaintiff did not notify her supervisors that she would be late after lunch in returning to her assigned work station which resulted in a delay with patient care.

On May 9, 2019, there were a series of inappropriate incidents between plaintiff and Cumbo at the work place, (*see* Doc. 34 at 12-14), which culminated in Cumbo contacting HR to discuss them. HR advised Cumbo to issue plaintiff a PIP regarding the May 1 and May 9, 2019 incidents. Plaintiff was then issued a PIP on May 13, 2019, by Cumbo and Konopke. (Doc. 34-

1, Ex. I). Since the PIP is in the record, it speaks for itself and it is not repeated herein.

As part of the PIP, plaintiff was issued an Action Plain with specific goals listed. (Doc. 34-1, Ex. I). Since the Action Plan is in the record, it speaks for itself and is not repeated herein. Suffice to say that plaintiff was directed to avoid emotional outbursts in the workplace and to maintain proper professional conduct pursuant to the Code of Conduct.

On May 31, 2019, plaintiff was overheard by another therapist in the treatment hallway telling her doctor that no therapists would work with her on the weekend. The therapist reported the incident to Cumbo and the therapist explained that she found plaintiff's comments to be offensive because she was never asked by plaintiff to come in on the weekend to help her.

On June 4, 2019, several therapists reported to Cumbo that a new volunteer came in to Geisinger and that when she met with plaintiff in the treatment hallway along with several others, plaintiff commented, "you wouldn't make it working here, you think out of the box like me and that is not allowed here."

Consequently, on June 6, 2019, Cumbo, Keifer, and plaintiff met to discuss the May and June incidents. As to the first incident, Cumbo reminded plaintiff of Geisinger's policy that any therapist on call who felt they needed

assistance when coming in on the weekend may call any other therapist in with her for help. Cumbo and Keifer also asked plaintiff about the incident with the volunteer, when plaintiff made comments about thinking outside the box, and plaintiff responded by stating that there was free speech in the country.

Plaintiff then began to leave the June 6th meeting to attend an appointment, and Cumbo asked plaintiff if she could return to work after the appointment to finish her shift, and plaintiff responded she may be able to return. However, when plaintiff returned from her appointment, she went to Starbuck, and stated, "I am leaving, I have had enough harassment for one day." Plaintiff then left and did not complete her work shift that day.

Due to plaintiff's continued performance issues, discussed above, Cumbo again spoke with the HR Department and Melissa Cuesta reviewed all the information, and then recommended suspending plaintiff pending an investigation.

On June 7, 2019, Cumbo spoke with plaintiff and advised her that she was being suspended pending an HR investigation by Cuesta regarding the June 6, 2019 incidents. Plaintiff testified that Cumbo told her that her suspension would be without pay unless she used her vacation time. Plaintiff

opted to use her vacation time for her suspended days so she received pay during her entire suspension. (Doc. 42 at 69).

Cumbo then brought the suspension PIP to plaintiff, but plaintiff refused to sign the document, and told Cumbo, "you are ridiculous if you want an unlawful termination lawsuit you will have it, you are a fool." Plaintiff admitted to making this comment to Cumbo, but testified that she told Geisinger her suspension was "foolish."

Following the HR Department's investigation conducted by Cuesta, Geisinger made the decision to terminate plaintiff's employment on June 13, 2019. Since the termination PIP is in the record along with the specific reasons for plaintiff's termination, it speaks for itself and is not repeated herein. (Doc. 34-1, Ex. L, June 13, 2019 PIP). In short, the PIP informed plaintiff that she was being terminated by Geisinger due to her "continued inappropriate and disrespectful behaviors exhibited in the workplace with management and staff within patient care areas, leaving the workplace without permission, creating a hostile work environment by not adhering to the polices and procedures [of her] employment with Geisinger."

The following facts relate to plaintiff's retaliation claims and her allegations that she was terminated by Geisinger for complaining about racial discrimination towards patients in the Radiation Department.

14

Prior to her termination, on March 29, 2019, plaintiff reported alleged discriminatory conduct by staff regarding patients in the Radiation Department (the "Report"). Plaintiff specifically was told that she would be protected against retaliation with respect to her Report. Based on the plaintiff's Report, Geisinger's Senior Human Resource Generalist, Konopke, conducted an investigation into the discrimination allegations. (Doc. 34-1, Ex. B, Konopke Affid. & Ex. M).

Konopke then conducted an investigation, which included interviewing several employees, however, he did not inform any employee as to who made the discrimination complaint. Also, during the investigation, Konopke reminded each employee interviewed of Geisinger's policy against retaliation.

In the beginning of April 2019, Cumbo was advised that a complaint was made about discriminatory conduct as to patients in the Radiation Department, but she had no role in the investigation into the complaint. Cumbo was then interviewed by Konopke during April 2019 as part of the investigation, and at that time she was unaware that a Geisinger employee made the Report. (Doc. 34-1 at 5).

At the completion of Konopke's investigation, one employee, R.S., was terminated by Geisinger for misconduct effective April 25, 2019. No other

employee was terminated or disciplined as a result of the investigation into plaintiff's Report.

There is no dispute that plaintiff's Report of discrimination was made two and one half months prior to her termination of employment with Geisinger on June 13, 2019.

Plaintiff testified that on April 25, 2019, Cumbo called her into the office and told her that she should not have spoken to employee Kerri Michalik about racism in the Radiation Department, and that Cumbo told her to go home. (Doc. 42 at 19-20).

## III.  DISCUSSION[3]

In Count I, plaintiff raises Title VII claims of retaliation and a retaliatory hostile work environment as well as similar retaliation claims under the PHRA

---

[3]The court notes that since the parties state the correct legal standard with respect to a motion for summary judgment under Fed.R.Civ.P. 56(c) in their briefs, the court will not repeat it herein. Suffice to say that if the moving party meets its burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party", In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003), then the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

against Geisinger, and in Count III, she raises an aiding and abetting retaliation claim against Cumbo under the PHRA.[4]

In Count I, plaintiff essentially alleges that Geisinger retaliated against her due to her reporting discriminatory conduct on March 29, 2019. Specifically, plaintiff alleges that she reported racism by Geisinger employees against Black and Latinos, and discrimination against non-English speaking patients, namely, by claiming that the therapists would require minorities and non-English speaking patients to state their names and birth dates in English before receiving treatment instead of providing an interpreter. Plaintiff also reported that staff referred to minority patients using derogatory terms.

In Count III, plaintiff alleges that Cumbo, as her supervisor, was aiding and abetting Geisinger when it retaliated against her "for complaining about

-------------------

[4]The court does not distinguish between the plaintiff's Title VII and PHRA claims against Geisinger in Count I, and will analyze these claims together, because "the same standards govern each." McNeill v. Greyhound Lines, Inc., 628 F. App'x 101, 103 n. 1 (3d Cir. 2015) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999)); see also Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 327 (3d Cir. 2015); Fogleman v. Mercy Hosp., 283 F.3d 561, 567 (3d Cir. 2002) ("The language of the PHRA is ... substantially similar to [Title VII and other federal] anti-retaliation provisions, and we have held that the PHRA is to be [ ] interpreted as identical to federal anti-discrimination laws except where there is something specifically different ....").

racial, national origin discrimination/hostile work environment", in violation of the PHRA.

### 1. Title VII and PHRA Claims for Retaliation

The court will first address Count I, in which plaintiff raises essentially two different claims for Title VII and PHRA violations against Geisinger, namely, one for retaliation and one for retaliatory hostile work environment.

In order to establish a retaliation claim in violation of Title VII, a plaintiff must prove a *prima facie* case by providing facts showing that: (1) she was engaged in a protected activity; (2) she has suffered an adverse employment action based on exercise of the protected activity; and (3) there is a causal link between the protected activity and the adverse employment action. Hussein v. UPMC Mercy Hospital, 466 Fed. Appx. 108, 111-12 (3d Cir. 2012) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)); Farrell v. Planters Lifesavers Company, 206 F.3d 271, 279 (3d Cir. 2000). Further, plaintiff must show a causal connection between her participation in a protected activity and the adverse employment action. Thomas v. Pocono Mtn. Sch. Dist., 2011 WL 2471532, *8 (M.D. Pa. June 21, 2011). "Causation 'may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Id.* (citation omitted).

As to the first element, Geisinger concedes, for present purposes, that plaintiff engaged in protected activity when she complained on March 29, 2019 about discrimination by employees against patients. (Doc. 35 at 11). Thus, the court finds that plaintiff has satisfied the first element of her retaliation claim. *See* Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d 535, 552 (W.D. Pa. 2009) ("A plaintiff must participate in a protected activity to establish a retaliation claim", and "[p]rotected activity includes formal charges of discrimination."). The court also finds that plaintiff has shown that she opposed an employment practice made illegal by Title VII. "Title VII's anti-retaliation provisions [42 U.S.C. §2000e-3] protect employees who oppose employment practices made illegal by Title VII." Brangman v. AstraZeneca, LP, 952 F.Supp.2d 710, 721 (E.D. Pa. 2013).

At issue is whether plaintiff has established the remaining two elements of her Title VII retaliation claims. The court in Larochelle v. Wilmac Corp., 210 F.Supp.3d 658, 698 (E.D. Pa. 2016), discussed the second element of a retaliation claim. The court stated that "retaliation claims—unlike other Title VII claims—do not limit adverse employment actions to those that 'affect the terms and conditions of employment.'" *Id.* (citing Moore, 461 F.3d at 341). The court explained that "[w]hat is required is a showing that a reasonable employee would have found the retaliatory actions 'materially adverse,'

19

which means that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citations omitted).

To satisfy the third, "material adversity," element of a retaliation claim, plaintiff must prove that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Hare v. Potter, 220 Fed.Appx. 120, 128 (3d Cir. 2007) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006)). Thus, "[w]ith respect to the causation component, the court must consider whether 'a reasonable jury could link the employer's conduct to the retaliatory animus.'" *Id.* (citing Jensen v. Potter, 435 F.3d 444, 449 n. 2 (3d Cir. 2006)). "To assess this, the court may consider the 'temporal proximity' between the plaintiff's protected activity and the employer's allegedly retaliatory response, and the 'existence of a pattern of antagonism in the intervening period.'" *Id.* (citation omitted).

Here, regarding the adverse employment actions by Geisinger, plaintiff alleges that after she reported the alleged discriminatory conduct on March 29, 2019, she was retaliated against by being harassed, reprimanded, disciplined, suspended without pay, and ultimately fired by Cumbo. In particular, plaintiff alleges that on April 25, 2019, she was harassed by Cumbo when she received a reprimand for pointing out that the racial

discrimination had occurred in their department. Plaintiff further alleges that on May 1, 2019, she was "bullied" by Cumbo when Cumbo gestured her to stop speaking to her and by refusing to listen to her concerns.

Additionally, plaintiff alleges that on May 5, 2019, she was put "on call" for her birthday even though every other year therapists were off on their birthdays. On May 9, 2019, plaintiff alleges that she was dismissed from work by Cumbo in retaliation for her complaint about the racial discrimination.

At the end of May 2019, plaintiff claims that she was given a lower performance review by Cumbo pointing out that she was cited for "Opportunity for Improvement" even though she usually received better evaluations.

On June 7, 2019, plaintiff states that she was suspended without pay.

Finally, on June 13, 2019, plaintiff alleges she was terminated "in retaliation for having blown the whistle on the mistreatment of non-English speaking patients, minorities and reporting racial discrimination."

The court finds that although an unpaid suspension can qualify as an adverse employment action for purposes of retaliation, *see* Friel v. Mnuchin, 474 F.Supp.3d 673, 690 (E.D. Pa. 2020), in this case when plaintiff was suspended on June 7, 2019, it is undisputed that she used her vacation time and was paid during her entire suspension. Here, the court finds that the

plaintiff's loss of a few days of accrued vacation leave is not an adverse employment action since she did not suffer any loss of pay. *See* Grooms v. City of Philadelphia, 2018 WL 4698856, at *5 (E.D. Pa. Sept. 28, 2018) (holding that the loss of annual leave "was not 'serious and tangible' enough to constitute a material change to the terms of employment because there is 'no permanent reduction in [plaintiff's] compensation'") (citing Deans v. Kennedy House, Inc., 998 F. Supp. 2d 393, 411 (E.D. Pa. 2014) ("Deans I"), aff'd, 587 F.App'x 731 (3d Cir. 2014).

Plaintiff's placement on a PIP, prior to her termination, was not an adverse action since it was not accompanied by a decrease in pay, benefits or her employment status. *See* Reynolds v. Dep't of Army, 439 F.App'x 150, 153-54 (3d Cir. 2011). The reprimand plaintiff received on April 25, 2019, was not a formal discipline and did not result in a suspension. *See* Friel v. Mnuchin, 474 F.Supp.3d 673, 689 (E.D. Pa. 2020) (holding that "[n]either the counseling memo nor the performance evaluation were adverse employment actions" since "[t]he counseling memo was advisory" and "[] did not impose any disciplinary consequences, and only warned of possible future action if he engaged in similar behavior again.") (citing Weston, 251 F.3d at 431 (finding no adverse employment action where plaintiff failed to show the

written reprimands caused a material change in the terms or conditions of his employment).

Nor are the alleged "bullying" and dismissal from work by Cumbo adverse actions. These actions are not sufficient to "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68, 126 S.Ct. 2405. Additionally, these actions did not change or affect plaintiff's employment status and they were not materially adverse in any other sense.

Further, plaintiff's end of May 2019 performance review was not an adverse employment action since she failed to demonstrate that the lower review had any tangible consequences for her employment. *See* Friel, 474 F.Supp. 3d at 689 (citing Clark v. Phila. Hous. Auth., 701 F.App'x 113, 117 (3d Cir. 2017) (finding no adverse action for purposes of retaliation where plaintiff did not show her negative performance review adversely affected the terms or conditions of her employment); Barnett v. N.J. Transit Corp., 573 F.App'x 239, 244 (3d Cir. 2014) (finding no adverse action for purposes of retaliation where plaintiff "failed to show, or even allege, that [the negative performance review] had any effect on her employment status).

Moreover, it is significant that the alleged actions taken by Cumbo that resulted in some type of discipline to plaintiff do not show retaliatory motive

since plaintiff admitted in her deposition that she engaged in the conduct that lead to her discipline and her termination. (Doc. 34, SMF ¶¶34, 48-49, 52, 54, 63-64, 73, 89, 94).

Similarly, the other conduct plaintiff alleges was retaliatory, such as the failure to be considered for the Daisy Award and the failure to be transferred, do not show retaliatory motive since plaintiff admitted that the denial of these benefits were due to her being placed on a PIP at the time.

Plaintiff being placed on-call for her birthday was not a change in her schedule and did not constitute any material change in the terms or conditions of her employment. Further, plaintiff was free to find a substitute therapist to work for her on her birthday.

Additionally, several other supervisory personnel at Geisinger along with Cumbo were involved in issuing all of the disciplinary measures on plaintiff, including, Konopke, Keifer, and Cuesta. In fact, plaintiff was not terminated until Cuesta conducted her independent investigation into plaintiff's misconduct and, there is no evidence that Cuesta was even aware of plaintiff's report of discrimination. As indicated, when Konopke conducted his investigation into plaintiff's report, he did not reveal the identity of the complainant.

Thus, the court finds that none of the above stated incidents that occurred after plaintiff's report of racial discrimination and before her termination are actionable adverse employment actions, or actions attributable to Geisinger, under Title VII. *See* Atkinson v. N. Jersey Developmental, 453 F.App'x 262, 263-64, 266 (3d Cir. 2011) (finding no adverse employment events when supervisor gave the plaintiff a low performance review, issued her a warning for arriving late, denied her vacation request, adjusted her duties, and exchange heated words with her).

It is clear that the plaintiff's June 13, 2019 termination constituted a materially adverse change in her employment status, *see* Paradisis v. Englewood Hosp. Med. Ctr., 680 F.App'x 131, 136 (3d Cir. 2017) ("An actionable adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."), and the court finds that this is the only adverse employment action for purposes of analyzing plaintiff's Title VII retaliation claims against Geisinger.

Next, the court finds that even though plaintiff's June 13, 2019 termination qualified as an adverse employment action, she has failed to demonstrate that this action was causally connected to her protected activity

of reporting discrimination. Plaintiff's termination occurred more than two months after plaintiff's reporting of discrimination on March 29, 2019. The court finds that this timing does not suggest causation. *See* Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' ..."). The court finds that the time gap in this case of over two months is too long to show an inference of retaliation based on the temporal proximity between the protected activity and adverse action. *See* Shinn v. FedEx Freight, Inc., 783 F.App'x 229, 233-34 (3d Cir. 2019) (termination two months after protected activity "is too long to suggest a causal relationship"); Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 261 n.8 (3d Cir. 2017) (2-month gap between protected activity and adverse employment action does not raise an inference of causation); Ward v. Ingersoll-Rand Co., 688 F.App'x 104, 110-11 (3d Cir. 2017) (adverse action two months after protected activity "does not support a casual inference."); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (2-month gap between protected activity and adverse action not suggestive of retaliation).

Plaintiff filed a notice of supplemental authority citing Kengerski v. Harper, 6 F.4th 531, 541 n. 9 (3d Cir. 2021), as support for her contention that she has shown a *prima facie* case of causation between her Report and her termination. (Doc. 45). In Kengerski, *id*., the Third Circuit essentially noted temporal proximity was not the only way to decide whether plaintiff has provided "sufficient [evidence] to raise the inference that [her] protected activity was the *likely reason* for the adverse [employment] action", and that "[w]hile a very long delay may suggest[ ], by itself, no causality at all, "[i]n the absence of ... temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." (internal quotations and citations omitted).

No doubt that "[t]he proffered evidence, looked at as a whole, may suffice to raise the inference [of causation], and that it is a "highly context-specific" inquiry in determining whether such an inference has been established. Carvalho-Grevious, 851 F.3d at 260.

As discussed above, in addition to finding that the over 2-month gap between the plaintiff's Report and her termination does not raise an inference of causation, the court has considered the circumstances as a whole in

finding that plaintiff has failed to establish a *prima facie* case of causation. The court has found that plaintiff failed to present sufficient evidence suggesting that Geisinger had a retaliatory animus nor that there were inconsistencies in the reasons Geisinger gave for her termination. Rather, there was an abundance of evidence in the record, detailed above, to show that it was plaintiff's own repeated misconduct in the workplace, both before her report and after it, that caused her termination. The court has also found that there is no evidence that the decision to terminate plaintiff was motivated in any way by retaliatory animus, and that based on plaintiff's history with Geisinger and her violations of its Code of Conduct, "a reasonable jury could [not] link [Geisinger's] conduct to [any] retaliatory animus." Jensen v. Potter, 435 F.3d 444, 449 n. 2 (3d Cir. 2006).

Plaintiff repeatedly points to her testimony during her successful appeal for Pennsylvania unemployment compensation benefits in which she stated that she never violated Geisinger's Code of Conduct. (*See* Doc. 38, Ex. A, CD containing the audio transcript of plaintiff's unemployment compensation hearing). Plaintiff's offers the audio transcript to support her contention that she did not violate Geisinger's Code. Plaintiff also points out that at the unemployment compensation hearing, Konopke admitted that her

discriminatory complaints about patient treatment at Geisinger were substantiated.

"Under Pennsylvania law, discharge ... for willful misconduct connected with ... work disqualifies an employee from unemployment compensation. 43 Pa. Cons. Stat. Ann. §802(e)." Gilson v. Pa. State Police, 157 F.Supp.3d 528, 564-65 (W.D. Pa. 2016) (internal quotations and citations omitted). "The Pennsylvania Supreme Court has defined 'willful misconduct' to mean wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has a right to expect of an employee, or negligence indicating an intentional disregard of the employer's interest or of the employee's duties and obligations to the employer." *Id*. (internal quotations and citations omitted).

Plaintiff basically contends that there is a genuine issue of material fact concerning whether she violated Geisinger's Code and engaged in "willful misconduct" since she applied for and was awarded, on appeal, unemployment compensation benefits after her termination. Since plaintiff prevailed in her appeal, it appears that plaintiff's conduct was found not to constitute "willful misconduct" within the meaning of Pennsylvania's unemployment compensation statute.

29

However, "[u]nder Pennsylvania law, factual findings in an unemployment compensation administrative proceeding are given no preclusive effect in subsequent civil litigation." *Id*. at 566 n. 31 (citing 43 Pa. Stat. Ann. §829 (West) ("[n]o finding of fact or law, judgment, conclusion or final order made with respect to a claim for unemployment compensation under this act may be deemed to be conclusive or binding in any separate or subsequent action or proceeding in another forum."); Mathis v. Christian Heating and Air Conditioning, Inc., 91 F.Supp.3d 651, 657–58 (E.D. Pa. 2015); Training Associates Corp. v. Unemployment Comp. Bd. of Review, 101 A.3d 1225, 1234 (Pa. Commw.Ct. 2014)). Further, "[u]nder 28 U.S.C. §1738, because Pennsylvania courts do not give preclusive effect to decisions made with respect to a claim for unemployment compensation, there is no legal basis upon which a federal court can do so." Williams v. Temple Univ. Hosp., Inc., 345 F.Supp.3d 590, 595 (E.D. Pa. 2018) (string citations omitted).

In any event, although plaintiff was successful with her appeal of unemployment compensation benefits and plaintiff was found not to have committed "willful" and "gross" misconduct as defined by Pennsylvania's unemployment compensation statute, this is not determinative of whether Geisinger found that she violated its Code of Conduct especially since

plaintiff admitted in her deposition that she engaged in the conduct that lead to her termination. (Doc. 34, SMF ¶¶34, 48-49, 52, 54, 63-64, 73, 89, 94). Nor is plaintiff's award of unemployment compensation benefits determinative of whether there was a causal link between plaintiff's report and her termination with respect to her Title VII retaliation claims against Geisinger. *See id*. at 595-96 (holding that a proceeding regarding whether a claim for unemployment benefits was wrongfully denied are "conducted without discovery, and presided over by referees in the first instance", and "[they] are hardly an appropriate forum for vindicating important rights protected by federal law."). Thus, as the court in Williams, *id*. at 596, found, "[the court] conclude[s] that the unemployment compensation proceedings lack preclusive effect [in federal employment discrimination action]."

The court has also found that the alleged antagonizing actions occurring after her report, including unfriendly treatment and harassment by co-workers, were not materially adverse actions and that they were not attributable to Geisinger. In fact, there is no credible evidence that any of these actions were approved by Cumbo or any other supervisor, and plaintiff fails to show *respondeat superior* liability. "When a hostile work environment is created by an individual's co-workers, rather than his supervisors, the

employer is not automatically liable." <u>Tarr v. FedEx Ground</u>, 398 Fed.Appx. 815, 819 (3rd Cir. 2010) (citation omitted).

Thus, the court finds that plaintiff has failed to make out a *prima facie* case of retaliation under Title VII through direct evidence against Geisinger, and a reasonable jury could not find that plaintiff was terminated in retaliation for reporting protected activity under Title VII.

Moreover, even if the plaintiff seeks to establish a *prima facie* case of retaliation through indirect evidence, she fails when applying the McDonnell Douglas burden-shifting framework. *See* Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 198-99 (3d Cir. 2015) (Court held that a plaintiff who seeks to prove his Title VII retaliation claim through indirect evidence, can do it by utilizing the McDonnell Douglas burden-shifting framework.). Even applying the burden-shifting framework, as discussed, plaintiff has clearly not met her burden by showing "by a preponderance of the evidence that there is a 'but-for' causal connection between the adverse employment action and retaliatory animus." Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 258 (3d Cir. 2017) (holding that "the Supreme Court has made clear that 'Title VII retaliation claims must be proved according to traditional principles of but-for causation.'") (citation omitted).

Also, insofar as plaintiff is deemed to be proceeding under a pretext theory, she has failed to submit evidence to "convince the factfinder that [Geisinger's] proffered non-retaliatory explanation [i.e., its supervisors and its HR personnel were not satisfied with plaintiff's work conduct and her insubordination] was false, and that retaliatory animus was the '*real reason* for the adverse employment action.'"). *Id.* (emphasis original) (citation omitted). Further, Geisinger has articulated legitimate, non-retaliatory reasons for plaintiff's suspension and her termination that plaintiff has failed to present evidence of pretext for retaliatory animus. Geisinger has provided an abundance of evidence that plaintiff was suspended and then terminated for making several unprofessional, inappropriate and rude comments to her co-worker therapists (some in front of patients) and to her supervisors Cumbo and Starbuck, as well as insubordination. In fact, as mentioned, plaintiff did not dispute that the incidents detailed above occurred while she was working at Geisinger and that frequently patients could hear her unprofessional remarks. Further, Geisinger found that plaintiff's conduct violated its Code of Conduct, and she was repeatedly reminded this by Cumbo as well as members of the HR Department, including Keifer and Cuesta. It is of no moment that plaintiff challenges the credibility of Geisinger and its supervisors and testified why she thought Cumbo erroneously cited

33

her for Code violations and insubordination since to discredit Geisinger's non-retaliatory reasons for her termination, plaintiff "cannot simply show that [Geisinger's] decision was wrong or mistaken, since the factual dispute at issue is whether [retaliatory] animus motivated [Geisinger], not whether [Geisinger was] wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Nor is there any merit to plaintiff's pretext conspiracy theory since the undisputed facts show that several other Geisinger employees, in addition to Cumbo, were involved in plaintiff's counseling, discipline, and termination. In fact, the record reflects that Cumbo alone did not issue any of the discipline upon which plaintiff relies. As detailed above, personnel of the HR Department as well as other department personnel were involved with all of the plaintiff's counseling, formal discipline, and termination.

Thus, the court finds there is not sufficient evidence in the record to show that the decisions by Geisinger, Cumbo, Keifer, and Cuesta were in any way motivated by plaintiff's reporting of discrimination by employees.

Further, at the summary judgment stage, it is not the court's role "to decide whether Defendant's proffered legitimate, non-discriminatory reason for Plaintiff's termination was 'warranted' (i.e. that [Cumbo, Keifer, Starbuck, and Cuesta's] assessment of Plaintiff's performance was accurate), but

instead decide whether Plaintiff has shown that reason was likely a pretext for discriminatory animus." Teubert v. SRA Internat'l, Inc., 192 F.Supp.3d 569, 576 (D. N.J. 2016). Here, as mentioned, plaintiff has not shown that Geisinger's proffered reasons for her termination were likely a pretext for discriminatory animus.

In short, plaintiff has not met her burden of establishing a causal link between her protected activity and the adverse employment actions by showing a pattern of antagonism as well as temporal proximity "unusually suggestive of retaliatory motive." *See* Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000). Thus, a reasonable jury could not link Geisinger's conduct after plaintiff reported the discrimination, through its decision makers, including Cumbo, Keifer, and Cuesta, to any retaliatory animus.

As such, since plaintiff has failed to meet her ultimate burden of showing that retaliatory animus was the "but-for" cause of the adverse employment action (i.e., her termination), defendants' motion for summary judgment with respect to plaintiff's claims of retaliation under Title VII and the PHRA against Geisinger, Count I, will be granted.[5] *See* Washington v.

---

[5]Since Geisinger is entitled to summary judgment on plaintiff's Title VII retaliation claim, it is likewise entitled to summary judgment on her PHRA

SEPTA, 2021 WL 2649146, *27 (E.D. Pa. June 28, 2021) ("At the summary judgment stage, an employer can prevail by showing that the trier of fact could not conclude, as a matter of law, (1) retaliatory animus played a role in the employer's decision making process, and (2) that it had a determinative effect on the outcome of that process.") (internal citation and quotations omitted).

### 2. Hostile Work Environment Claim

In Count I, plaintiff also asserts a retaliation hostile work environment claim against Geisinger. The usual discriminatory hostile work environment framework applies equally to claims of retaliatory hostile work environment. Komis v. Sec'y of United States Dep't of Lab., 918 F.3d 289, 293 (3d Cir. 2019).

"To succeed on a hostile work environment claim [against the employer], the plaintiff must establish that 1) the employee suffered intentional discrimination because of [her protected activity], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a

---

retaliation claim. *See* Brugh v. Mt. Aloysius College, 432 F.Supp.3d 566, 578 (W.D. Pa. 2020).

reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted).

"When a workplace is so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [a] victim's employment and create an abusive working environment, Title VII is violated." Oncale v. Sundowner Offshore Srvs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

"To establish that a supervisor's harassment culminated in a tangible employment action, 'a plaintiff must show that the tangible employment action was related to, or caused by, the alleged unlawful harassment or retaliation.'" Bumbarger v. New Enterprise Stone and Lime Co., Inc., 170 F.Supp.3d 801, 841 (W.D. Pa. 2016) (citation omitted). "The Supreme Court has clarified that an individual qualifies as a supervisor in harassment actions 'only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 837-38.

"[A] court's hostile work environment analysis 'must concentrate not on individual incidents, but on the overall scenario' because it is often difficult to determine the motivation behind allegedly discriminatory actions." Syed v. YWCA of Hanover, 906 F.Supp.2d 345, 355 (M.D. Pa. 2012) (citation omitted). "In assessing the evidence presented, [the court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is ... relevant.... but while psychological harm ... may be taken into account, no single factor is required.'" Miller v. Thomas Jefferson Hosp., 565 Fed.App'x 88, 93 (3d Cir. 2014) (citation omitted).

Here, plaintiff's retaliatory hostile work environment claim fails since the court has found that she has not produced sufficient evidence to show she suffered intentional retaliation because of her protected activity. Komis, 918 F.3d at 299 (even if plaintiff alleges several incidents of hostility regarding a retaliatory hostile work environment claim, plaintiff still has the "burden to show the allegedly hostile work environment was motivated by retaliatory animus.").

As discussed at length above, the court has found that plaintiff has failed to produce sufficient evidence causally linking the alleged retaliatory actions in the workplace with her report of discrimination. The court has also found that while her termination was an adverse employment action, plaintiff failed to show that it was causally connected to her protected activity. Further, the court has found that plaintiff had work performance and conduct issues prior to her report, and there is no dispute that she engaged in the conduct that resulted in the disciplinary actions taken against her after her Report and that resulted in her termination. No doubt that if the alleged adverse employment actions pre-date the protected activity, then the employee cannot show that they were causally connected to the protected activity, she cannot satisfy the third element of a retaliation claim based upon them. *See* Friel, 474 F.Supp.3d at 689.

In fact, plaintiff's evidence largely reflects unfriendly co-workers who at times would not speak to her and would throw out the things she gave them, and this is not materially adverse conduct. Nor is this conduct sufficient to show intentional retaliation since it has not been shown that this conduct was any way related to plaintiff's report of discrimination. In fact, the issues between plaintiff and some of her co-workers dated back before she ever complained of discrimination. "In determining whether harassment is

sufficiently severe or pervasive to create a hostile work environment, we consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening ... or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance.'" Friel, 474 F.Supp.3d at 692 (quoting Mandel, 706 F.3d at 168). Further, "[i]t is not enough that 'the employee subjectively perceives [the environment] as abusive or hostile[.]'" Id. (quoting Ullrich v. U.S. Sec'y of Veterans Affairs, 457 F. App'x 132, 140 (3d Cir. 2012)). Rather, "[t]he environment must also be 'objectively hostile or abusive,' one 'a reasonable person would find hostile or abusive.'" Id.

As the court in Friel, 474 F.Supp.3d at 692, explained:

Not all workplace harassment violates Title VII. Title VII "does not set forth 'a general civility code for the American workplace.'" Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68, 126 S.Ct. 2405 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). It does not prohibit "all verbal or physical harassment in the workplace[.]" Id. Only harassment motivated by a discriminatory animus is prohibited. Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 278 (3d Cir. 2001) (citing Spain v. Gallegos, 26 F.3d 439, 447–48 (3d Cir. 1994)).

Based on the foregoing, the court will grant defendants' summary judgment motion with respect to plaintiff's Title VII and PHRA hostile work environment claim against Geisinger in Count I.

### 3. Aiding and Abetting Under the PHRA

Finally, in Count III, plaintiff claims that Cumbo aided and abetted Geisinger when it retaliated against her for complaining about racial discrimination in violation of the PHRA. However, since the court has found that Geisinger is not liable on plaintiff's claims of retaliation under Title VII, as well as under the PHRA, the court will grant defendants' motion for summary judgment regarding the plaintiff's claim for individual liability against her supervisor Cumbo for aiding and abetting under the PHRA.

As the court in Washington v. SEPTA, 2021 WL 2649146, *27 n. 53 (E.D. Pa. June 28, 2021), noted, "[t]he individual Defendant[] cannot be liable for retaliation under the PHRA because [she] can only be held liable for aiding and abetting under the PHRA, codified in 43 P.S. §955(e), "which forbids, 'any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice....'" (quoting Brzozowski v. Pa. Tpk. Comm'n, 165 F. Supp. 3d 251, 262-63 (E.D. Pa. 2016), aff'd as modified, 738 F.App'x 731 (3d Cir. 2018)). Thus, "[Cumbo] can be held liable under the PHRA for aiding and abetting [Geisinger's] retaliation, but [she] cannot be held liable for the retaliation itself." Id. However, "[t]here is no violation, and thus no liability, under Section 955(e)

when there is no corresponding [PHRA] violation by an employer to aid and abet." *Id*. at \*32 (internal quotations and citation omitted). As such, plaintiff's Section 955(e) claim against Cumbo fails because her retaliation claim against Geisinger under PHRA §955(d) failed, and "plaintiff has alleged no [] retaliation for [Cumbo] to aid and abet." *Id*. (citations omitted).

Thus, the court will grant defendants' summary judgment motion with respect to plaintiff's aiding and abetting claim under PHRA §955(e) raised against Cumbo in Count III of her amended complaint.


**IV.    CONCLUSION**

The defendants' motion for summary judgment, **(Doc. 33)**, will be **GRANTED IN ITS ENTIRETY** with respect to the plaintiff's remaining Title VII and PHRA claims against Geisinger in Count I and, with respect to her PHRA aiding and abetting claim against Cumbo in Count III of her amended complaint, **(Doc. 11)**. Further, **JUDGMENT** will be entered in favor of the defendants and against the plaintiff.  An appropriate order will issue.



s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**DATE**: **March 31, 2022**
20-45-02

42